**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X
JORDAN KAFENBAUM,               :

                             :

                Plaintiff,     :        Civil Action No.:

                             :

      v.                     :

                             :        **COMPLAINT**

SOULCYCLE INC., SUNDER REDDY and   :
ADRIENNE GEMPERLE, in their individual and  :
professional capacities,             :        <u>**Jury Trial Demanded**</u>

                             :

               Defendants.   :
------------------------------------------------------------ X

Plaintiff Jordan Kafenbaum ("Plaintiff" or "Ms. Kafenbaum"), hereby alleges through her counsel Wigdor LLP, as against Defendants SoulCycle Inc. ("SoulCycle" or the "Company"), Sunder Reddy ("Reddy"), in his individual and professional capacities and Adrienne Gemperle ("Gemperle"), in her individual and professional capacities, (collectively "Defendants") as follows:

<u>**SUMMARY OF CLAIMS**</u>

1.      On April 27, 2020, SoulCycle fired Ms. Kafenbaum, Senior Director of Instructor Programming and Talent Management, a position responsible for overseeing almost 400 instructors, just 32 days after Ms. Kafenbaum gave birth to her first child.

2.      Unforgivably, SoulCycle seized upon the horrific COVID-19 crisis as a pretextual opportunity to eliminate Ms. Kafenbaum by claiming an alleged "business" need to let her go. The facts tell a different story.

<u>**SoulCycle's False Promise of "Tolerance and Equality"**</u>

3.      Shamelessly what goes on behind closed doors at SoulCycle is in stark contrast to the brand's alleged commitment to "tolerance" and "equality."

4.     It is appalling that a company founded by and managed by women, and whose customers are predominantly women, would penalize its own female employees for childbirth and maternity leave.   All employees, regardless of gender, skin color or other protected classifications, deserve to work on a level playing field.

5.     Sadly, the horrific treatment of Ms. Kafenbaum shows that SoulCycle believes that being a dedicated mother and being a dedicated employee are mutually exclusive roles.

6.     In August 2019, the former CEO Melanie Whelan ("Whelan") told Gary Gaines ("Gaines"), Senior Vice President, Global Operations and Studio Experience, that:

### "Paternity leave is for pussies."

7.     Whelan made this shocking statement to Gaines in response to his planned paternity leave.[1]   News of the comment spread like fire through all levels of SoulCycle employees.   Such a statement is unlawful standing alone.   But when said by the CEO, it speaks volumes about the culture.

8.     Also in August 2019, the public learned that Stephen Ross, the head of Related Companies, SoulCycle and Equinox's parent company, held a $250,000 per person fundraiser in the Hamptons for President Donald Trump that generated millions.

9.     The outrage by its customer base was massive.

10.     In a feeble attempt to quell criticism, SoulCycle issued the following tweet:

---

[1]     Gaines submitted to the pressure and did not take leave.  Upon belief, Gaines' planned "leave" was only two weeks.  Whelan's vehement objection to this short-term leave suggests how senior management likely viewed the minimum 12-weeks of protected maternity leave afforded women.



11.     The last thing SoulCycle did when it learned that Ms. Kafenbaum was pregnant was "create a safe space" or show that it believed in "equality."

12.     Further undercutting SoulCycle's claims about its inclusionary culture are statements made in recent weeks by several female instructors in connection with their decision to quit SoulCycle.[2]

13.     On July 22, 2020, Mary Kate Hurlbutt, a former SoulCycle instructor, posted on Instagram[3]:

> I've been disheartened by [SoulCycle's] lack of response to the ongoing oppression, disenfranchisement, and endangerment that Black, Indigenous, and POC, and LGTQIA+ members of our community face daily. I've watched as we pour time, energy, and resources into creating thoughtful operational strategies to prioritize reopening our facilities in order **to generate revenue**; only to also witness the historical lack of time, energy,

---

[2]     https://www.dailymail.co.uk/femail/article-8556785/Three-SoulCycle-instructors-quit-accusations-racism-bigotry.html?ns_mchannel=rss&ns_campaign=1490&ito=1490.

[3]     @mkhurlbutt [https://www.instagram.com/p/CC9RfSgsYdF/?utm_source=ig_web_copy_link]

and resources that go toward creating a safe and inclusive environment for staff and riders alike. (emphasis added)

14.     Similarly, Soeuraya Wilson's July 15, 2020 Instagram post[4] reads in part:

"I can no longer allow my body to be used by a company that ultimately stands alongside its investors and individuals who continue to support racism and bigotry without true compassion for the health and wellness of the employees and riders…. I know this because my company and its leadership …have failed to lead."

15.     These suggestions cast doubt on whether tolerance and equality are true concerns at SoulCycle or whether, as in the case of Ms. Kafenbaum, it is the bottom line that controls critical decisions at SoulCycle. Whether SoulCycle marginalized and subjected female employees to "less than" treatment because of their skin color is directly relevant to whether senior management similarly fostered or allowed bias to exist against female employees that became pregnant.  A work culture that intimidates employees from speaking out about one protected class is more likely to silence and bully employees from speaking out about other perceived discrimination.

16.     Similar to the weak response about Stephen Ross's Southampton Donald Trump fundraiser, SoulCycle offered a hollow statement following the female instructors' Instagram posts.  Specifically, Reddy, the interim CEO and CFO, said that:

"Our focus has, and always will be, about building a community centered on our values, not politics... Given that we have a small number of studios open …. **our ability to make meaningful financial contributions to external organizations is limited today**."[5]

17.     SoulCycle appears to suggest that if it "could," the Company would consider donating money to "external organizations," presumably in support of BLM groups.  Blaming COVID-19 for the inability to make "meaningful financial contributions" is unpersuasive.

---

4       @rawbabysugar [https://www.instagram.com/p/CCq7ho1gA8_/?utm_source=ig_web_copy_link]
5       @soulcycle [https://www.instagram.com/p/CC9uZALJVtH/?utm_source=ig_web_copy_link]

Tellingly, SoulCycle says nothing about what it is doing to improve the <u>internal culture</u> it has direct control over.[6]

18.     Any attempt to similarly message a defense for its discriminatory treatment towards Ms. Kafenbaum's pregnancy and related leave will fall flat.

19.     There is no lawful justification for firing a senior executive, whose seven-year work anniversary was days away and a mere 32 days after giving birth and only four weeks into her maternity leave – at any time, much less six weeks into the COVID-19 quarantine.

20.     SoulCycle brands itself as a "caring" and "inclusive" space:

- Your Soul Matters.

- We are a "culture of yes."

- We empower our managers to treat their studio as their own business.

- We care, we work hard and we work together as a team.

- Pack. Tribe. Community.

- We are not a business that values only transactions, rather we create a community that cultivates and sustains relationships.

- Our immersive culture of inspiration and empowerment contributes to the engaged and connected rider base in each of our studios.[7]

21.     Contrary to such promises, Ms. Kafenbaum was singled out and subjected to unlawful bias by senior executives.

22.     No female employee at SoulCycle should have to worry about losing her job because she becomes pregnant and gives birth.  Yet, that is exactly what female employees need to worry about.

---

[6]      Undeterred by these recent accusations, SoulCycle decided to offer outdoor classes in the Hamptons (Water Mill and Bridgehampton) **at $50 per class** "to take place in a tent in a silent-disco style with headphones provided by the company."

[7]      https://www.sec.gov/Archives/edgar/data/1644874/000119312515270469/d844646ds1.htm

23.     For the reasons that follow, Ms. Kafenbaum commenced this action to hold SoulCycle accountable.

## JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.  This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

26.     On July 9, 2020, Plaintiff  filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") and Title VII as amended by the Pregnancy Discrimination Act of 1974 ("PDA").

27.     On July 29, 2020, Ms. Kafenbaum received a Notice of Right to Sue from the EEOC.

28.     Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

29.     Plaintiff has complied with any and all other prerequisites to filing this action.

## PARTIES

30.    Plaintiff Jordan Kafenbaum is a former Senior Director of Instructor Programming and Talent Management at SoulCycle Inc.  At all relevant times, Plaintiff met the definition of an "employee" under all applicable statutes.

31.    Defendant SoulCycle Inc. is a foreign business corporation with its principal place of business in New York County, New York, and is duly organized and existing under and by virtue of the laws of the State of Delaware.  At all relevant times, SoulCycle Inc. has met the definition of an "employer" of Plaintiff under all applicable statutes.

32.    Defendant Sunder Reddy is the interim Chief Executive Officer and former Chief Financial Officer at SoulCycle Inc. At all relevant times, Defendant Reddy has met the definition of an "employer" of Plaintiff under all applicable statutes.

33.    Defendant Adrienne Gemperle is the former Chief People Officer at SoulCycle Inc. At all relevant times, Defendant Gemperle has met the definition of an "employer" of Plaintiff under all applicable statutes.

## FACTUAL ALLEGATIONS

### Ms. Kafenbaum's Stellar Performance

34.    For the last seven years, Ms. Kafenbaum was a devoted and dedicated employee at SoulCycle.

35.    Since 2013, Ms. Kafenbaum worked her way up the leadership ladder, year after year, finally landing as Senior Director of Instructor Programming and Talent Management ("SDTM"), responsible for overseeing almost 400 instructors.

36.     Ms. Kafenbaum achieved this position because she established herself as a top performer and an employee that consistently added substantial value to the Company's bottom line.

37.     Only a handful of executives have a similar tenure or personal experience in watching the Company grow.  By way of example only, Ms. Kafenbaum helped open studio #18 and helped grow SoulCycle to almost 100 studios.

38.     There can be no question that Ms. Kafenbaum went above and beyond her expected responsibilities.  She believed in SoulCycle and was vested in its success.  In this regard, until her pregnancy, Ms. Kafenbaum received exclusively positive performance feedback.

39.     In fact, in the summer of 2019, prior to news of her pregnancy, her boss Gaines told Ms. Kafenbaum that he planned to promote her to the level of Vice President ("VP") in 2020 and have her take on the additional responsibilities of overseeing another department.

40.     Specifically, Gaines and Ms. Kafenbaum discussed Blake Ballard ("Ballard"), who was poised to move into a new role in talent development because of his disappointing performance in the role of Director of Operations.

41.     Gaines explained that it was likely that Ms. Kafenbaum would oversee Ballard in this new position, as well as become a VP.  Importantly, SoulCycle made such plans for Ms. Kafenbaum before it knew that Ms. Kafenbaum was pregnant.  Everything changed once that happened.

42.     Shockingly, despite these discussions about Ballard, on August 3, 2020, SoulCycle announced that Ballard had been promoted to Senior Director, Instructor Talent – Ms. Kafenbaum's exact position, where he performs her former functions.[8]

### News of Ms. Kafenbaum's Pregnancy

43.     During the summer of 2019, Ms. Kafenbaum learned the joyous and exciting news that she was pregnant.

44.     Thrilled, in September 2019, she shared her status with only a handful of people at SoulCycle, including Gaines, as well as her other supervisor, Halle Madia ("Madia"), Chief Talent Officer, Melanie Whelan ("Whelan") and Adrienne Gemperle ("Gemperle"), Chief People Officer.

45.     On November 6, 2019, Ms. Kafenbaum was in Miami at a SoulCycle conference with more than 100 employees in attendance.

46.     During a presentation by Gemperle to the group about the newly implemented policy at SoulCycle for parental leave, Gemperle said:

> Jordan Kafenbaum's mother actually just called to thank me for changing our policy because when we did ….
> **Jordan finally got pregnant!**

47.     Ms. Kafenbaum was embarrassed and shocked that details of her personal life were revealed in such a disparaging manner – as if she calculated the timing of her pregnancy only after knowing that she would be entitled to 12 weeks of paid leave.

48.     Immediately after the presentation, Ms. Kafenbaum was bombarded with questions and comments about her pregnancy.

---

[8]     Worse, as detailed *infra*, Ms. Kafenbaum was told before she gave birth that Ballard, the same employee that Ms. Kafenbaum was told may report to her, would assume her role while she was out on leave.

49.     Any reasonable executive (especially a "people officer") would understand that such a comment was unprofessional and insensitive, not to mention unlawful.

50.     Tellingly, several employees in Human Resources ("HR") that were present expressed their shock at Gemperle's conduct to Ms. Kafenbaum.

51.     Later that day, Ms. Kafenbaum complained to Gaines and Madia about her pregnancy being disclosed by Gemperle's backhanded disclosure of her protected status.   In response, Gaines and Madia said that they would speak with Gemperle.

**Ms. Kafenbaum Complains Directly to Gemperle**

52.     Weeks after the Miami conference, Ms. Kafenbaum continued to be upset by what happened.

53.     After hearing nothing from Gemperle, she requested to speak to her.

54.     On December 5, 2019, the two women met.   During this conversation, Ms. Kafenbaum expressed to Gemperle her distress and objection to what Gemperle said. Marginalizing her valid complaint, Gemperle said she was only repeating a "joke" she heard from another SoulCycle employee.

55.     Again, despite Gemperle's obvious failure to recognize the impropriety of her own conduct, there is no question that Gemperle heard Ms. Kafenbaum's complaint, and that her complaint stemmed from Gemperle's own conduct.

56.     Contrary to her role, and no doubt extensive training in such areas, Gemperle reacted in classic retaliatory fashion.

57.     Immediately after this conversation, Ms. Kafenbaum noticed a tangible shift in the way that Gemperle treated her.

58.     Among the textbook retaliation for engaging in protected complaints was Gemperle's silent treatment and exclusion of Ms. Kafenbaum from decisions within her role.  By way of example only, in early March 2020, knowing that Ms. Kafenbaum needed to hire help for the Company's hotline and knowing that multiple communications about the issue transpired between Ms. Kafenbaum, her team and recruiting, Gemperle nevertheless undermined Ms. Kafenbaum by instructing recruiting to answer to Ballard about the issue.

59.     Not only was Ms. Kafenbaum the person responsible for the hotline, but, at this time, Ballard's work had nothing to do with Ms. Kafenbaum's team.

60.     Additionally, by way of example only, a few weeks after Ms. Kafenbaum complained directly to Gemperle about what she said in Miami, Gemperle was present during a meeting Ms. Kafenbaum had with her team concerning an upcoming equity distribution for instructors.  After the meeting, Gemperle reported to Gaines, who also was present at the meeting, that she thought Ms. Kafenbaum's tone was "disrespectful" and "negative."

61.     When Gaines told Ms. Kafenbaum about the criticism, he mentioned that he did not notice any issues with her tone at the meeting.

62.     Ms. Kafenbaum again reminded Gaines about her objection to Gemperle's statement regarding her pregnancy at the Miami conference.  Ms. Kafenbaum told Gaines that she believed that she was being targeted because she complained directly to Gemperle.  Sadly, Gaines' response was "Wow, I didn't realize you confronted her about the summit – that's really interesting."  Gaines never followed up on the issue.

### Ms. Kafenbaum Suffers Further Discrimination and Retaliation

63.     In early January 2020, Ms. Kafenbaum was about 29 weeks pregnant.

64.     As such, she was visibly showing and most employees knew that she was expecting in March 2020.

65.     Just two months earlier, Whelan stepped down and Sunder Reddy ("Reddy"), the CFO, was named interim CEO.

66.     In January 2020, as part of Reddy's new role and Whelan's leadership exit, Reddy and Gaines embarked upon a series of visits to SoulCycle locations across the U.S. to meet personally with instructors and staff, referred internally as a "roadshow."  Ms. Kafenbaum was responsible for the management of these individuals, although curiously, she was not asked to go with them.

67.     Notably, Madia also was excluded from the excursions, which internally created some discussion about whether Gaines and Reddy were enjoying the male only aspect of the business trips.

68.     The alleged purpose of the "roadshow" was to hold roundtable discussions with instructors and staff to solicit feedback in person about employee concerns, yet Reddy's eye, as the CFO and now interim CEO, was toward fiscal tightening and reducing redundancies.

69.     Subsequent to the roadshows, on February 11, 2020, Ms. Kafenbaum was scheduled to meet Gaines for their regular 1:1.  Unbeknownst to Ms. Kafenbaum, Madia planned to and did attend this 1:1 meeting.

70.     Astonishingly, Gaines began the meeting by telling Ms. Kafenbaum that her team **"needs a new leader."**  Without even attempting to provide an explanation for this shocking news, Gaines and Madia further said that they **"wanted to find a different place"** for Ms. Kafenbaum.

71.     In confounding fashion, they feigned reassurance that Ms. Kafenbaum was a "leader," yet simultaneously spoke about other roles for her after she returned from maternity leave.[9]   The two suggested that perhaps a "better fit" for her was in a role to sell corporate bookings or to run Class Pass relationships that were being discussed but not even in existence at SoulCycle.

72.     Notwithstanding that these roles had no relation to her role as SDTM and were unquestionably lower, less important positions (with uncertainty about whether Class Pass ever would be utilized), Gaines and Madia offered no rational justifications for what clearly was an intended demotion in status.

73.     Knowing that any indication that her compensation would be reduced after the birth of her child was inescapable discrimination, the Company pathetically believed it could use backdoor compliance by keeping Ms. Kafenbaum's title and salary intact.   In this regard, SoulCycle failed miserably.   Worse, Gaines and Madia told Ms. Kafenbaum that Ballard, the same employee that Ms. Kafenbaum was told may report to her, would assume her role while she was out on leave.

### SoulCycle's Shifting Explanations Reek of Unlawful Bias

74.     As is obvious, SoulCycle knew weeks before it fired Ms. Kafenbaum that it was engaging in blatant pregnancy discrimination and retaliation.

75.     As a result, SoulCycle attempted to hedge what its ultimate explanation for her exit would be.   But the various shifting, nebulous, excuses offered by SoulCycle became so confusing and confounding that even SoulCycle could not keep its own narrative straight.

---

[9]     Notably, on at least one occasion after Gaines specifically referred to her leave as 12 weeks, Ms. Kafenbaum clarified that she was entitled to 16 weeks.  Such clarification brought obvious distress to Gaines.

76.     As further explained below, among the inconsistent excuses offered by SoulCycle were: (i) department re-organization, (ii) performance concerns, (iii) position elimination, and, finally, (iv) a horrific, global pandemic.  All of the various justifications reek of pretext, and, in fact, when viewed under the applicable standard of the totality of the circumstances, show blatant discrimination and retaliation.

77.     SoulCycle's unlawful intentions were clear from the conversations with Gaines and Madia and further solidified over the course of the next few weeks.  Included among the shocking and suspect narratives conveyed to Ms. Kafenbaum were that SoulCycle needed to "rethink her team's organization and structure," as well as a purported elimination of her SDTM position.

78.     In direct conflict with a message of eliminating her position entirely was an underlying storyline based on roadshow feedback relating to the performance of Ms. Kafenbaum's team, and therefore imputed to her.

79.     Despite the reference to her "team," there was no question that the Company was using vague statements about Ms. Kafenbaum's "aggressive tone," and examples from a few disgruntled instructors, to suggest that Ms. Kafenbaum really was not such a great leader.

80.     Again, giving lip service to the applicable anti-discrimination laws, SoulCycle knew that "elimination" was cleaner than any performance-based justification for her adverse employment treatment, and therefore repeatedly fell back on this rationale.

81.     Despite repeated requests by Ms. Kafenbaum for specifics about the specious reports of complaints, Gaines and Madia failed to provide her any information that supported this narrative.

82.     In sum, Ms. Kafenbaum suddenly found herself a leader with no employees and perceived by senior executives as collateral baggage due to her upcoming temporary absence for the birth of her child.

83.     Simply too many examples of the shifting stories that show the unlawful bias inflicted on Ms. Kafenbaum exist to include here.  However, a sampling of what was said and what topics were discussed as between Gaines, Madia and Ms. Kafenbaum during and after the February 11, 2020 meeting, include, *inter alia*:

- Gaines said, "We recognize you are 33 weeks pregnant and there is an expectation of us turning something around on how to restructure the team."

- Gaines said, "You will get to write this story however you want to."

- Gaines said, "The Team needs a new leader."

- Gaines admitted that he had not subjected Ms. Kafenbaum to any performance management because she did not "deserve it."[10]

- Madia and Gaines told her they wanted to find a "different place" for Ms. Kafenbaum and said leadership wanted that to happen, yet no one, including Gemperle, provided Ms. Kafenbaum any clarification.

- Her department needed a different structure and her SDTM role as it existed in February 2020 was not an option.

- Madia and Gaines told Ms. Kafenbaum that after maternity leave, she could come back as a Senior Director and they would "see where" she "would fit in."

- Madia and Gaines suggested that perhaps she could sell corporate bookings but later Gaines retracted that suggestion because another employee already handled this function, saying "I misspoke when I mentioned that possibility."

- Madia and Gaines suggested that perhaps she could work on Class Pass relationships knowing that the service was being discussed as a possibility but that it was not a done deal, thereby offering her a role for a function that easily may never exist.

---

[10]     Curiously, Ms. Kafenbaum's annual review was postponed several times and ultimately canceled.

- Madia claimed that Ms. Kafenbaum was not a line item because if she were a line item SoulCycle would be giving her a package now (at eight months pregnant), even though that is exactly what happened.

- In connection with how such a dramatic pivot occurred from promises of VP and overseeing the Talent Development arm, to news about Ballard overseeing her team, Gaines said that there were no "guarantees" made to her in July 2019.

- Gaines said that perhaps Ms. Kafenbaum's "replacement" would be an external hire.

- Regarding the failure to consult Ms. Kafenbaum about who would be overseeing her responsibilities while she was on leave, and Ballard specifically, Gaines response was that Ballard was a "good leader" and he trusted Ballard.

84.     One risk SoulCycle would not face with Ballard: pregnancy, much less the potential for more than one pregnancy.[11]

85.     Without question, SoulCycle forced Ms. Kafenbaum's role to change, to her detriment, because of her anticipated maternity leave and the burden that her absence would inflict on those around her.

86.     Ms. Kafenbaum was subjected to one shifting inconsistent story after the next about alleged plans for a change in her position or purported role(s) being considered post maternity leave.  The many different versions of the truth offered up to Ms. Kafenbaum confirm that SoulCycle was more concerned about how her status impacted the bottom line rather than adhering to the laws in place to protect Ms. Kafenbaum.

87.     Compounding her pregnancy status was the underlying animus from Gemperle due to Ms. Kafenbaum daring to complain about what she said in Miami.

88.     Numerous meetings were held during which Ms. Kafenbaum specifically engaged in further protected speech about the Company's conduct, including with Betsy Bemer

---

[11]     This was Ms. Kafenbaum's first pregnancy.  At age 33, it was reasonably foreseeable for the Company to believe that she would have more than one child.

16

("Bemer") a Director in SoulCycle's HR department.  Nothing was done to remedy the situation. As such, the situation worsened for Ms. Kafenbaum.  Specifically, on February 20, 2020, the stress and emotional toll consumed Ms. Kafenbaum and she began vomiting that evening and continued throughout the night.

89.     By the next day, February 21, 2020, Ms. Kafenbaum landed in the labor and delivery floor of Cornell Presbyterian Hospital severely dehydrated – placing both her and her unborn child in serious physical danger.

90.     On February 25, 2020, Ms. Kafenbaum again met with Gaines and Madia. Shamelessly shifting the narrative one more time, Gaines told Ms. Kafenbaum that SoulCycle wanted her to return as a Senior Director on the Talent Team after she returned from her maternity leave.

91.     Understandably confused, Ms. Kafenbaum asked why she was now being offered a similar role to her current position even though Gaines and Madia told her that she could not return to her current position and Ballard was allegedly overseeing it.  Gaines responded that in **order to avoid legal liability**, SoulCycle had to provide her with the same title and pay after her maternity leave.

92.     Although inaccurate as to the law, Gaines' proffered explanations demonstrate SoulCycle's massive liability exposure in this case.

93.     Importantly, the various shifting stories also reveal that SoulCycle was busy violating the anti-discrimination laws throughout February 2020, even before the COVID-19 crisis manifested in late March and April 2020.

**Ms. Kafenbaum is Terminated Because She is Pregnant and Engaged in Protected Activity**

94.     By March 12, 2020, the Coronavirus pandemic was making its way across the country.

95.     SoulCycle held a meeting related to employees working remotely and, after the meeting, Gaines and Madia told Ms. Kafenbaum that she should no longer work from the office because commuting was not safe.

96.     Ms. Kafenbaum was told to leave work early and that she should work from home until after she gave birth.

97.     Over the course of the next several days, Ms. Kafenbaum and her team heard from numerous instructors who were distraught that they had to report to work in such dangerous conditions and feared for their physical safety.  Specifically, during conversations with Gaines and Madia, Ms. Kafenbaum pushed the Company to shut down the studios.

98.     In fact, Ms. Kafenbaum informed them that at least 50 instructors had called out from their classes because of their safety concerns and fear.

99.     Finally, on March 16, 2020, SoulCycle told employees that they could work from home and the office was open only to members of the leadership team and some support staff.

100.     SoulCycle also announced that it was closing all of its fitness studios in connection with shutdown orders.  Like all other employees, Ms. Kafenbaum continued to work from home.

101.     On March 25, 2020, she gave birth.

102.     A couple of days later, Ms. Kafenbaum shared the good news with Gaines and Madia.  Ms. Kafenbaum remained in contact with them over the next few weeks.  During one of

these group conversations, they recalled an incident where, disgustingly, Reddy subjected Ms. Kafenbaum to obscene and vulgar conduct.

### Reddy's Blow Job Comment

103.    In 2018, Ms. Kafenbaum had a meeting with Reddy, Madia and an instructor regarding this instructor's class rate and pending raise.

104.    Later that same day, Reddy came to Ms. Kafenbaum's office with Madia.  While she was sitting in a chair at her desk, and Reddy and Madia were sitting on the desk top, Reddy said that the instructor had sent Reddy an email thanking him for the meeting, after which Reddy then gestured with his hands and mouth what is commonly known to reference to a blow job.

105.    Disgusted, Ms. Kafenbaum later spoke to Madia about what happened and said that Reddy can "never do that" to her again.  Reddy never apologized to Ms. Kafenbaum for his crude, unlawful blow job simulation.

### SoulCycle Claims COVID-19 Caused Her Forced Exit

106.    On April 27, 2020, Gaines and Bemer called Ms. Kafenbaum and told her she was fired.  Deviating from the earlier pretextual reasons for an adverse employment action, Gaines claimed that SoulCycle was eliminating her position because of the financial impact of the Coronavirus.

107.    In a further attempt to insert a legitimate business necessity defense into the discriminatory decision, Gaines said other employees on her team were being terminated as well.

108.    Ms. Kafenbaum asked why she had been selected for termination and, if her position was actually being eliminated, why she could not take on another position as she was told she was going to be forced to do after returning from maternity leave.

109.    Gaines and Bemer ignored Ms. Kafenbaum's questions and Bemer claimed that SoulCycle did not have any role for her.

110.    Upon information and belief, SoulCycle also terminated three other female employees under suspect conditions.  Specifically, two area managers, Thea Keeling and Nikki DeMarzo had just returned to work following maternity leave, and Julie Lieberman, Senior Director of Buying and Merchandising, was eight months pregnant when all three were fired, allegedly because of the pandemic.

111.    Any claim that SoulCycle terminated Ms. Keeling, Ms. DeMarzo, Ms. Lieberman and Ms. Kafenbaum because of financial concerns resulting from the pandemic is undercut by the fact that, since closing its fitness studios in March 2020, SoulCycle has continued to pay its instructors 75% of their salaries, which has cost SoulCycle hundreds of thousands of dollars.

### SoulCycle's False Promise of "Equality"

112.    No employee at SoulCycle should have to worry about losing her job because she experiences childbirth.

113.     Ms. Kafenbaum experienced professional derailment simply because she became pregnant.

114.    Not only has SoulCycle violated federal law, its conduct with respect to Ms. Kafenbaum runs directly counter to the Company's alleged brand and values of "tolerance and equality."

115.    SoulCycle publicly has represented, *inter alia*, the following:

- Your Soul Matters.
- We are a "culture of yes."
- We empower our managers to treat their studio as their own business.
- We care, we work hard and we work together as a team.

- Pack. Tribe. Community.
- We are not a business that values only transactions, rather we create a community that cultivates and sustains relationships.
- Our immersive culture of inspiration and empowerment contributes to the engaged and connected rider base in each of our studios.[12]

116.    More recently, in response to criticism about Stephen Ross's intended fundraiser

for President Trump in the Hamptons, SoulCycle issued the following tweet:



117.    Shamelessly what goes on behind closed doors at SoulCycle is in stark contrast to

the alleged commitment to equality.  Indeed, the horrific treatment of Ms. Kafenbaum after she

became pregnant shows that SoulCycle believes being a dedicated mother and being a dedicated

employee are mutually exclusive roles.

118.    Demonstrating deep-rooted bias about the demands of leave related to the birth of

a child, the former CEO Whelan told Gaines that:

---

[12]    https://www.sec.gov/Archives/edgar/data/1644874/000119312515270469/d844646ds1.htm

## "Paternity leave is for pussies."

119.    Whelan made this appalling statement to Gaines last August in response to his planned paternity leave.  Based on the obvious disapproval by top executives, Gaines opted to pass on using the leave that he was entitled to under the New York City Human Rights Law.

120.    Not surprisingly, news of the horrific comment spread like fire through all levels of SoulCycle employees.  Such a statement is unlawful standing alone.

121.    When said by the CEO of SoulCycle however, it speaks volumes about the culture, lack of compliance to civil anti-discriminatory statutes and the belief that SoulCycle is free to operate above the laws that everyone else needs to follow.

122.    Based on the facts underlying Ms. Kafenbaum's claims, these beliefs are unmistakable.

123.    The above-described allegations show that such unlawful conduct was part of SoulCycle's operating patterns, practices and policies, and no female employee should undergo this as part of her childbearing experience.

124.    Ms. Kafenbaum seeks all relief available, including injunctive and equitable relief, all monetary and punitive damages available, or other legal relief pursuant to Title VII.

### FIRST CAUSE OF ACTION
**(Interference and Retaliation under the FMLA)**
***Against Defendant SoulCycle Inc.***

125.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

126.    At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA.  Similarly, at all times relevant herein, Defendant SoulCycle was and is a "covered employer" within the meaning of the FMLA.

127.    By the actions described above, among others, Defendant SoulCycle interfered with Plaintiff's rights under the FMLA and retaliated against Plaintiff on the basis of her decision to exercise her rights under the FMLA.

128.    As a direct and proximate result of Defendant SoulCycle's unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

129.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

130.    Defendant SoulCycle's unlawful and discriminatory actions constitute reckless intentional, malicious, willful and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

### SECOND CAUSE OF ACTION
**(Discrimination in Violation of Title VII and the PDA)**
***Against Defendant SoulCycle Inc.***

131.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

132.    By the actions described above, among others, Defendant SoulCycle discriminated against Plaintiff on the basis of her gender and pregnancy and motherhood status in violation of Title VII and the PDA by denying Plaintiff the same terms and conditions of employment available to males and/or non-pregnant employees, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and terminating her employment.

133.    As a direct and proximate result of the unlawful discriminatory conduct committed by Defendant SoulCycle in violation of Title VII and the PDA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

134.    As a direct and proximate result of the unlawful conduct committed by Defendant SoulCycle in violation of Title VII and the PDA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

135.    Defendants SoulCycle's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Title VII and the PDA, for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Retaliation in Violation of Title VII)**
***Against Defendant SoulCycle Inc.***

136.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

137.    By the actions described above, among others, Defendant SoulCycle retaliated against Plaintiff for complaining about unequal treatment on the basis of sex by altering her working conditions and terminating her employment.

138.    As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant SoulCycle in violation of Title VII, Plaintiff has suffered, and continues to suffer,

monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

139.    As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant SoulCycle in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

140.    Defendant SoulCycle's unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Discrimination in Violation of NYCHRL)**
***Against All Defendants***

141.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

142.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by denying Plaintiff the same terms and conditions of employment available to male employees, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and terminating her employment.

143.    The individual Defendants have discriminated or aided and abetted the discrimination against Plaintiff by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy the discriminatory conduct.

144.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

145.     As a direct and proximate result of Defendants' unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

146.     Defendants' unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION
**(Retaliation in Violation of NYCHRL)**
***Against All Defendants***

147.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

148.     By the actions described above, among others, Defendants retaliated against Plaintiff for complaining about unequal treatment on the basis of sex by altering her working conditions and terminating her employment.

149.     The individual Defendants retaliated or aided and abetted the retaliation committed against Plaintiff by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy the retaliatory conduct

150.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

151.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

152.   Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYCHRL)
### *Against Defendants Sunder Reddy and Adrienne Gemperle*

153.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

154.   Defendants Reddy and Gemperle knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYCHRL.

155.   As a direct and proximate result of the unlawful conduct of Defendants Reddy and Gemperle in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

156.     As a direct and proximate result of the unlawful conduct of Defendants Reddy and Gemperle in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

157.     The unlawful actions of Defendants Reddy and Gemperle were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Discrimination in Violation of NYSHRL)
#### *Against All Defendants*

158.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

159.     By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by denying Plaintiff the same terms and conditions of employment available to male employees, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and terminating her employment.

160.     The individual Defendants have discriminated or aided and abetted the discrimination against Plaintiff by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy the discriminatory conduct.

161.     As a direct and proximate result of the unlawful discriminatory conduct committed by Defendants in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

162.    As a direct and proximate result of the unlawful conduct committed by Defendants in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

163.    Defendants' unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Retaliation in Violation of NYSHRL)
### *Against All Defendants*

164.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

165.    By the actions described above, among others, Defendants retaliated against Plaintiff for complaining about unequal treatment on the basis of sex by altering her working conditions and terminating her employment.

166.    The individual Defendants retaliated or aided and abetted the retaliation committed against Plaintiff by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy the retaliatory conduct.

167.    As a direct and proximate result of the unlawful retaliatory conduct committed by Defendants in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

168.     As a direct and proximate result of the unlawful retaliatory conduct committed by Defendants in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

169.     Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive.

**NINTH CAUSE OF ACTION**
**(Aiding and Abetting in Violation of the NYSHRL)**
***Against Defendants Sunder Reddy and Adrienne Gemperle***

170.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

171.     Defendants Reddy and Gemperle knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYSHRL.

172.     As a direct and proximate result of the unlawful conduct of Defendants Reddy and Gemperle in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

173.     As a direct and proximate result of the unlawful conduct of Defendants Reddy and Gemperle in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

174.    The unlawful actions of Defendants Reddy and Gemperle were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State and City of New York;

B.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

D.      An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E.      An award of punitive damages;

F.      An aware of liquidated damages;

G.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  August 11, 2020
        New York, New York

                                Respectfully submitted,

                                **WIGDOR LLP**

                                By: _____
                                        Jeanne M. Christensen
                                        Taylor J. Crabill

                                85 Fifth Avenue
                                New York, NY 10003
                                Telephone: (212) 257-6800
                                Facsimile: (212) 257-6845
                                jchristensen@wigdorlaw.com
                                tcrabill@wigdorlaw.com

                                *Counsel for Plaintiff*